Filed 10/4/24  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY LOPEZ,<br><br>Defendant and Appellant. | F085300<br><br>(Super. Ct. No. 1073884)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 2007, a jury convicted appellant Robert Anthony Lopez of murder in the shooting death of Daniel Morales, assault with a deadly weapon upon Gonzalo Villanueva, and of active gang participation in a criminal street gang.  He was tried with

his codefendant, Manuel Domingo Hernandez.  Lopez was sentenced to 40 years to life in prison.  We affirmed Lopez's judgment in a 2011 opinion.  (*People v. Lopez* (June 28, 2011, F058857 [nonpub. opn.].).)

Lopez now appeals from an order denying his petition for resentencing under Penal Code section 1172.6,[1] which limits accomplice liability for murder.  His opening brief advances two independent grounds for reversal.  He first contends the trial court applied the wrong standard of proof at the evidentiary hearing on the petition.  He also contends that, even if the trial court applied the correct standard, insufficient evidence supports a finding that he is guilty of murder under the current murder statute.

We asked the parties to submit supplemental briefing on whether Lopez is not entitled to relief as a matter of law because he was not convicted under a natural and probable consequences theory or felony murder theory.  In his supplemental brief, Lopez asserts the jury instructions impermissibly allowed the jury to convict him of second degree murder as a direct aider and abettor on an imputed malice theory based on his participation in the fist fight that precipitated the deadly shooting.  But at the time of his 2007 trial, it was already settled law in California that a direct aider and abettor may not be convicted of murder on an imputed malice theory; the aider and abettor must possess malice aforethought.  (*People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 935 (*Berry-Vierwinden*), citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*).)  Relying on *Berry-Vierwinden*, we conclude that Lopez's claim of instructional error fails to establish that he "could not presently be convicted of murder or attempted murder *because of changes* to Section 188 or 189 made effective January 1, 2019" by Senate Bill No. 1437 (2017–2018 Reg. Sess.)  ("SB 1437").  (§ 1172.6, subd. (a)(3), italics added.)

---

[1] Undesignated statutory references are to the Penal Code.

He therefore is not eligible for relief as a matter of law because he cannot meet section 1172.6, subdivision (a)(3).  We accordingly affirm.

## STATEMENT OF THE CASE

In October 2004, the Stanislaus County District Attorney filed a three-count information against 16-year-old Lopez and 24-year-old Manuel Hernandez.  The information charged both defendants with murder (§ 187, count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and actively participating in a criminal street gang (§ 186.22, subd. (b)(1); count 3).  As to count 1, it was further alleged that a principal intentionally and personally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d) and (e)(1).)  As to counts 1 and 2, it was further alleged the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)).

Lopez and Hernandez were tried together in 2007.  The jury convicted Lopez on all counts and found true all enhancement allegations.  As to Hernandez, the jury was hung on the murder count, but the jury convicted him on the assault and gang participation counts.  The trial court sentenced Lopez to a total term of 40 years to life in prison.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Trial evidence

Daniel Morales was shot to death at around 3:30 p.m. on April 6, 2004.  He was 16 years old.  Jesus Elizarraraz had known Morales for a year or two and they were close friends.

On April 6, Elizarraraz, Morales, and Villanueva headed to a Modesto shopping mall around noon to "hang out and shop."  They did not have any alcohol, drugs, guns, billy clubs, or any other weapons with them.  The three spent about an hour at the mall and then left and headed to a taco stand to get something to eat.  It was about 3:00 p.m.

After they pulled into the parking lot of the taco stand, Elizarraraz noticed a car pull up to the red light at the corner; the driver gave Elizarraraz a "mean look." Elizarraraz identified Hernandez as the driver and said Hernandez yelled something, but there was too much traffic noise to make out the words.

The three friends got their food and sat down at an outside table to eat. About five minutes later they saw Hernandez's car, which was "full" of people, turn into the lot. The four occupants of the car got out and began walking toward Elizarraraz, Morales, and Villanueva. When the four men approached, Elizarraraz and his friends began walking away because they felt "threatened."

Elizarraraz and his friends were backing away because "[w]e didn't want to turn our backs towards them." As the four men got closer, Villanueva began to run; Elizarraraz and Morales were face to face with the four men. Two of the men with Hernandez took off after Villanueva. As Villanueva was running away, one of the assailants hit him in the back of the head with "some kind of hard thing." After he was hit, Villanueva kept running. The blow to his head left him with a scar.

Hernandez and Lopez faced Elizarraraz and Morales. Elizarraraz identified Lopez at trial. Hernandez pointed a gun in Elizarraraz's face. Lopez asked, "Are you ready for this?" A fist fight then broke out between Morales and Lopez. Hernandez turned his attention to the fist fight and Elizarraraz turned and ran. When he got near the bathrooms to the taco shop, Elizarraraz heard three or four gunshots. He could not see who fired because he had his back to the fight as he ran away. After he heard the shots, Elizarraraz climbed onto the roof of the bathrooms and heard Hernandez say, "We've got one of them, let's get out of here."

Villanueva also heard the shots, but he did not see who fired them. Villanueva remembered Hernandez was wearing a red jersey.

4.

While on the roof, Elizarraraz saw all four assailants run back to their car and climb in; he also saw Hernandez place something under the seat. Hernandez drove away with the other three passengers.

Elizarraraz went to help Morales, who was bleeding. Villanueva returned to help Morales, as did others at the scene. Someone called for the police and an ambulance, and both arrived shortly.

Elizarraraz acknowledged "hanging around" Sureño gang members and that the Sureño color was blue. He denied knowing that Morales or Villanueva were gang members. Modesto is known as a Norteño town; the Norteño gang color is red; Morales was wearing blue the day of the shooting. After the shooting, Elizarraraz moved out of state. The prosecution paid for his travel and lodging expenses so he could return and testify.

Villanueva acknowledged he had served time in prison for two weapons offenses and that he was on parole at the time of trial for a gang-related gun possession offense. He stated he began carrying a gun after Morales was shot. Villanueva acknowledged that he and Morales were Sureño gang members.

Modesto Police Officer David Watson stopped Hernandez's car shortly after the shooting. Modesto Police Office Jason Stewart handcuffed Hernandez and noticed his hands were "really wet and cold," "like if you're rinsing your hands off and didn't dry them."

A search of Hernandez's car revealed a bicycle security chain and lock. A search of Lopez's home revealed a BB gun, a .22-caliber handgun, and .22-caliber ammunition. It could not be determined conclusively if the .22-caliber bullets recovered from Morales's body had been fired by the .22-caliber gun recovered from Lopez's home.

Villanueva selected Lopez's picture from a photographic lineup. Elizarraraz and Villanueva made in-field identifications of Hernandez.

5.

Ed Campbell, then a Stanislaus County sheriff's detective, interviewed Lopez. Lopez denied being at the taco stand at the time of the shooting. He claimed to have been visiting with a friend, R.M., the whole afternoon. He and R.M. had attended a quinceanera practice and then went to a tuxedo shop.

R.M.'s mother testified that she saw R.M. and Lopez talking outside the gate to her yard the afternoon of the shooting. R.M. testified he and Lopez spent the afternoon together. They talked after school for a while, but R.M. could not recall exactly how long, although he thought it may have been a few hours.

A gang expert, Froilan Mariscal, testified that Norteños claim the color red and Sureños claim the color blue. Mariscal also testified that rival gangs were at "war" with each other, leading to killings. Morales was killed in an area of Modesto known as Norteño territory.

Hernandez was wearing a belt buckle with the letter "N" at the time of his arrest. He also had many gang tattoos and had a red bandanna tied around the steering column of his car. Hernandez had admitted to California Youth Authority officials that he was a Norteño and Sureños were his rivals.

Lopez's gang affiliations included being suspended from school for flashing gang signs, engaging in fights with known Norteño gang members, and committing a theft with known Norteño gang members. Lopez had been arrested for theft, prowling, conspiracy, and obstructing an officer in connection with a theft committed with a Norteño gang member.

Hernandez testified in his own behalf. He admitted gang membership. Hernandez said he saw Lopez standing over Morales, with his arm outstretched, and then heard five or six shots. Hernandez claimed Lopez was the shooter and that he, Hernandez, did not know Lopez had a gun with him.

Lopez did not testify.

## II. Closing arguments, jury instructions, and verdict

In closing arguments, before the court's jury instructions, the prosecutor contended that Hernandez had the gun at first and brandished it in Elizarraraz's face. Hernandez then gave the gun to Lopez who shot Morales. The prosecutor did not advance a theory of murder liability for either Lopez or Hernandez under the felony murder rule, the natural and probable consequences doctrine, or any other theory of imputed malice.

In instructing the jury, the trial court administered pattern instructions on murder, including CALCRIM No. 520, which defined malice, both express and implied. CALCRIM No. 520 defined express malice as follows: "The defendant acted with *express malice* if he unlawfully intended to kill." The instruction defined implied malice as follows: "The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

The trial court also instructed the jury on direct aider and abettor liability, including CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. Two, he may have aided and abetted someone else, who committed the crime. In these instructions, I will call that other person the 'perpetrator.' A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

7.

The trial court also administered CALCRIM No. 401, the standard instruction on direct aiding and abetting liability, which stated in pertinent part that to prove a defendant guilty based on a theory of aiding and abetting, the People must prove:  "[¶]  1. The perpetrator committed the crime;  [¶]  2.  The defendant knew that the perpetrator intended to commit the crime;  [¶]  3.  Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

The jury was not instructed on the natural and probable consequences doctrine, the felony murder rule, or any other theory of imputed malice.  As to the natural and probable consequences doctrine, the jury was not instructed with CALCRIM Nos. 402 or 403.  As to the felony murder rule, the jury was not instructed with any CALCRIM instructions from the felony murder series.

As mentioned, the jury convicted Lopez of murder but hung on the murder count as to Hernandez.  The jury convicted both Lopez and Hernandez of assault with a deadly weapon and participating in a criminal street gang.  As to Lopez's murder conviction, the jury found true the firearm use enhancement allegation and the gang participation enhancement allegation.

## III.    Section 1172.6 proceedings

In January 2019, Lopez, representing himself, filed a section 1172.6[2] petition with the trial court.  Lopez used a form to prepare his petition which required him to check boxes to assert his basis for relief.  Based on the boxes he checked, he alleged that he was convicted of second degree murder under the natural and probable consequences doctrine

---

[2] When Lopez filed his petition, the section was numbered 1170.95.  But effective June 30, 2022, section 1170.95 was renumbered as section 1172.6.  (Stats. 2022, ch. 58 (AB 200) § 10.)

or under the second degree murder felony murder doctrine and that he could not now be convicted of murder because of changes to section 188.

The trial court appointed counsel for Lopez. The People's initial response to Lopez's petition was a long brief arguing largely that section 1172.6 was unconstitutional. But eventually the People conceded that Lopez had "stated a prima facie case, so the matter … needs to proceed to an evidentiary hearing." In light of the concession, the trial court, which was the same judge who oversaw the original trial, ordered an evidentiary hearing on the petition.

At the evidentiary hearing in November 2022, the People relied on the trial record and did not introduce any additional evidence. The People argued that the evidence proved two theories of murder liability beyond a reasonable doubt. The People first argued that the evidence proved beyond a reasonable doubt that Lopez was the actual killer. In the alternative, they argued the evidence proved Lopez was guilty of murder as an aider and abettor of Hernandez.

After hearing the parties' arguments, the trial court denied relief, concluding that "Lopez could be again tried under both theories that he was the actual killer based on the testimony at trial or that he was a direct aider and abettor who shared the intent to kill based on the evidence exhibited before, during, and after the incident itself." Defense counsel asked the trial court to "please pick a theory" and "state the facts" which support that theory. The prosecutor responded that the trial court needed to decide whether Lopez "would" be convicted rather than "could" be convicted but disagreed that the court had to "decide one theory or the other."

The trial court admitted it misspoke by saying "could" instead of "would," but still refused to pick a theory of liability. The court said that "it would get to the jury to decide whether [Lopez] was the direct killer or whether he was a direct aider and abettor who shared the intent to kill."

9.

Defense counsel asked, "Is the Court declining to state the facts upon which it is making its determination?" The trial court said yes and reiterated its belief that "it's not up to me to decide what I would do but what a jury would do if the People were to proceed again." Defense counsel reminded the court of its obligation to "act as a factfinder" and "find facts so that they can be reviewed by the Court of Appeal[.]" Again, the trial court declined to state which theory the People had proven beyond a reasonable doubt.

## DISCUSSION

In his initial briefing, Lopez contends the trial court violated section 1172.6 when it refused to decide which of two inconsistent theories of murder liability had been proven beyond a reasonable doubt and instead merely found sufficient evidence for both theories to be presented to a jury. He also alternatively contends that neither theory of murder liability was supported by sufficient evidence. The People in their initial briefing insist that the trial court applied the correct standard of proof, and that sufficient evidence supported both their express malice theory and their aiding and abetting theories of murder culpability.

After reviewing the initial briefs and the record, we observed that Lopez's jury was not instructed on the felony murder rule or the natural and probable consequences doctrine. We also observed that Lopez was convicted of murder, but Hernandez was not; the jury was hung on Hernandez's murder liability. In light of these observations, we requested supplemental briefing from the parties. We asked the parties to address whether Lopez was ineligible for relief as a matter of law for section 1172.6 relief because the jury was not instructed on either a felony murder theory or natural and probable consequences theory. We also asked the parties to address the significance, if any, of (1) the jury's finding as to the firearm enhancement to the murder count that Lopez "was a principal" in the murder and (2) the fact that the jury convicted Lopez of

10.

murder but not Hernandez.  As to the second fact, we inquired whether we could deduce that the jury convicted Lopez on the theory that he was the actual killer.  That is, we asked whether the jury would have convicted Lopez on an imputed malice theory of a murder committed by Hernandez, yet not convict Hernandez of that murder.

Both parties submitted supplemental briefs.  In contrast to their earlier position, the People now argue Lopez was ineligible for relief as a matter of law because the jury was not instructed on a now-invalid theory of murder.  That is to say, Lopez failed to state a prima facie case for relief.  The People also explain that we cannot deduce anything from the firearm enhancement finding or from the fact that Lopez was convicted but not Hernandez.  This is because there were two unidentified, uncharged people with Hernandez and Lopez, one of whom theoretically could have been the actual killer.  The People also point out that the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1), permits a true finding when a co-participant uses the weapon.

Lopez first argues in his supplemental brief that, under the principle of party presentation, the People have forfeited any argument that he failed to establish a prima facie case for relief under section 1172.6 and this court may not raise the issue for the People.  He next argues that even though jurors were not instructed with either felony murder or natural and probable consequences theories, the instructions allowed malice to be imputed to Lopez based on his participation in a fist fight.  He also asserts as the People did that nothing can be deduced from the firearm enhancement finding or from the fact that the jury was hung on Hernandez's murder culpability.

We first conclude we are not prohibited under the principle of party presentation from considering whether Lopez is eligible for section 1172.6 relief as a matter of law.  We next conclude Lopez was ineligible for relief as a matter of law because he cannot show under section 1172.6, subdivision (a)(3), that he "could not presently be convicted

11.

of murder or attempted murder *because of changes* to Section 188 or 189 made effective January 1, 2019" by SB 1437.  (§ 1172.6, subd. (a)(3).)

## I.    Overview of Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, SB 1437 limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)  SB 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.").  As amended by Senate Bill No. 775, effective January 1, 2022, these ameliorative changes to the law expressly apply to attempted murder and voluntary manslaughter.

SB 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder, attempted murder, or voluntary manslaughter under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*Lewis, supra,* 11 Cal.5th at p. 959; *Gentile, supra,* 10 Cal.5th at p. 847.)  A defendant commences that procedure by filing a petition containing a declaration that, among other things, " '[t]he petitioner could not presently be convicted of murder or attempted murder because of the changes to Section 188 or 189 made effective January 1, 2019,' the effective date of [SB] 1437."  (*People v. Strong* (2022) 13 Cal.5th 698, 708; § 1172.6, subd. (a)(3).)

12.

At the prima facie stage, the trial court takes as true the petitioner's factual allegations and assesses whether the petitioner would be entitled to relief if those allegations were proved. (*Lewis, supra,* 11 Cal.5th at p. 971.) In determining whether the petitioner has made a prima facie case for relief, the trial court may look at the record of conviction, including jury instructions, verdicts and closing argument, to determine readily ascertainable facts such as the crime of conviction. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 815; see, e.g., *People v. Harden* (2022) 81 Cal.App.5th 45, 56.) At the prima facie stage, the trial court does not engage in factfinding that involves the weighing of evidence or exercise of discretion. (*Lewis*, at p. 972.) If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing. (§ 1172.6, subds. (b)(3), (c), & (d)(1).) At the evidentiary hearing, each party may present new evidence and the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under current law. (§ 1172.6, subd. (d)(3).)

A trial court's failure to comply with these statutory requirements is harmless if the record of conviction establishes that a petitioner is ineligible for section 1172.6 relief as a matter of law. (See *Lewis, supra,* 11 Cal.5th at p. 973.) "A petitioner is ineligible for resentencing as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with malice aforethought that was not imputed based solely on participation in a crime." (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14 (*Lopez*).) The record of conviction includes the trial court's own documents, jury

summations, jury instructions, verdict forms, and prior appellate opinions.[3] (*Lewis, supra,* 11 Cal.5th at pp. 971–972.) If the record contains facts refuting the allegations in the petition, the court may make a credibility determination adverse to the petitioner. (*Id.* at p. 971.)

Whether the record of conviction shows the petitioner is ineligible for section 1172.6 relief as a matter of law is a legal question that we review de novo. (*Lopez, supra,* 78 Cal.App.5th at p. 14.)

## II.     Relevant murder law

Murder is the unlawful killing of a human with malice aforethought. (§ 187, subd. (a).) Malice is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

A defendant is liable as a direct aider and abettor of express malice murder if the defendant aided or encouraged the murder with knowledge of the perpetrator's unlawful purpose and with the intent or purpose of committing, encouraging, or facilitating the murder's commission. (*In re Lopez* (2023) 14 Cal.5th 562, 579; *People v. McCoy* (2001) 25 Cal.4th 1111, 1122 (*McCoy*) [direct aiding and abetting is based on participants' combined actus reus and aider and abettor's own mens rea].)

In contrast, a defendant is liable as a direct aider and abettor of implied malice murder if the defendant, by words or conduct, aids the commission of a life-endangering act, not the act's result. (*Reyes, supra,* 14 Cal.5th at p. 991.) The direct aider and abettor

---

[3] However, Senate Bill 775 prevents a trial court from relying on facts recited in an appellate opinion to rule on a petition under section 1172.6, as the statute now provides that "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law" and "the *procedural history* of the case recited in the prior appellate opinion." (§ 1172.6, subd. (d)(3), italics added.)

must know that the perpetrator intended to commit *the act*, intend to aid the perpetrator in committing *the act*, know that *the act* is dangerous to human life, and act in conscious disregard to human life.  (*Ibid.*)

In accordance with these principles, the trial court here instructed Lopez's jury on murder with CALCRIM No. 520 and on aiding and abetting with CALCRIM No. 401.

## III.    Lopez is ineligible for relief as a matter of law

Lopez is ineligible for relief as a matter of law because he cannot meet section 1172.6, subdivision (a)(3), which requires him to show that he "could not now be convicted of murder because of changes to Section 188 or 189 made effective [by SB 1437]."  (§ 1172.6, subd. (a)(3).)  His supplemental brief clarifies that his petition is based on the issue that the jury instructions at his trial impermissibly allowed the jury to impute malice to him.   The brief implies this issue is based on changes effected by SB 1437.  However, it was already established at the time of Lopez's 2007 trial that a direct aider and abettor may not be convicted of murder on an imputed malice theory; the aider and abettor must possess malice aforethought.  (*Berry-Vierwinden, supra,* 97 Cal.App.5th at p. 935, citing *McCoy, supra,* 25 Cal.4th at p. 1118.)  Thus, the issue serving as the basis for his section 1172.6 petition existed before SB 1437's passage; SB 1437 did not create the issue.  The issue could have been brought on direct appeal, but it was not, and *Berry-Vierwinden, supra,* 97 Cal.App.5th 921, holds that a petitioner may not raise a claim in a section 1172.6 petition that could have been raised on direct appeal. (*Id.* at p. 936.)

### A.    Principle of party presentation

Lopez asserts that the People forfeited any argument that he is ineligible for section 1172.6 relief as a matter of law because the prosecutor conceded below that Lopez had pled a prima facie case.  He argues that party presentation and separation of powers principles preclude us from raising the issue sua sponte.

Under the party presentation principle, parties "frame the issues for decision" while courts take "the role of neutral arbiter of matters the parties present" (*Greenlaw v. United States* (2008) 554 U.S. 237, 243) and " 'normally decide only questions presented by the parties.' " (*United States v. Sineneng-Smith* (2020) 590 U.S. 371, 376, quoting *United States v. Samuels* (8th Cir. 1987) 808 F.2d 1298, 1301.) The Supreme Court has explained that the "principle is supple, not ironclad." (*Sineneng-Smith*, at p. 376.)

Also, as Lopez points out, courts have recognized that permitting reviewing courts to introduce arguments on behalf of the state requires judges to do "a job the prosecutor is supposed to do and would be coming perilously close to exercising an executive branch function. This confusion of roles would be inconsistent with the neutrality expected of the judiciary in our adversary system of justice." (*Rose v. United States* (D.D.C. 1993) 629 A.2d 526, 535; accord, *United States v. Gonzalez-Flores* (9th Cir. 2005) 418 F.3d 1093, 1101.)

We do not believe these principles of judicial restraint are violated by consideration of whether Lopez is eligible for section 1172.6 relief as a matter of law. By raising this eligibility question, we are not helping the prosecution convict Lopez; he has already been convicted and is serving a prison sentence. As we will explain, on its face the record shows he is not entitled to have his conviction vacated. This means that no factfinding or additional evidence is needed to determine his ineligibility. When the prosecution initially conceded Lopez had stated a prima facie case for relief, Lopez was moved a step closer toward relief to which he is not entitled. Party presentation and separation of powers principles do not require us to ignore the fact that Lopez is ineligible *as a matter of law* to have his murder conviction vacated.[4]

---

[4] Lopez's counsel did not respond to this court's first letter to the parties asking if they wished to have oral argument in this appeal. It was after we sent this first letter about oral argument that we sent our supplemental briefing order to the parties. After

16.

## B. Section 1172.6, subdivision (a)(3), cannot be met

Lopez relies on *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), to support his argument made in his supplemental briefing that he is entitled to relief because the jury instructions at his trial allowed the jury to convict him of murder as an aider and abettor on an imputed malice theory. *Powell* and *Langi* addressed jury instructions similar to the ones given here. *Powell* addressed instructional error on direct appeal, while *Langi* found the petitioner had established a case for relief under section 1172.6 because of ambiguities in the jury instructions. (*Powell*, at p. 714; *Langi*, at pp. 982–983.)

In *Powell*, defendants Powell and Langlois, together with two other people, broke into the victim's home, seeking to retaliate for an altercation earlier that day. (*Powell, supra,* 63 Cal.App.5th at pp. 691–692.) Powell and Langlois, and possibly a third man, beat the victim and fled. (*Id.* at p. 692.) The prosecution contended Powell inflicted the fatal wound. (*Ibid.*) As to Langlois, the prosecution advanced two theories of liability: "(1) direct aiding and abetting express malice murder, and (2) indirect or extended liability for the natural and probable consequences of the assault Langlois aided and abetted." (*Id.* at p. 708.) Powell and Langlois were convicted of second degree murder and first degree residential burglary; both appealed. (*Id.* at pp. 705–706.)

The *Powell* court found that the standard CALCRIM aiding and abetting instruction (CALCRIM No. 401) was "not tailored for" the crime of second degree implied malice murder. (*Powell, supra,* 63 Cal.App.5th at p. 714.) The court noted that for implied malice murder liability, "[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the*

---

sending the order, we sent a second letter asking the parties if they wanted oral argument in light of the issues raised in the order. Lopez's counsel again failed to respond. We note this only to show our efforts to afford the parties full opportunity to address the question of Lopez's eligibility for section 1172.6 relief.

17.

*act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, fn. omitted.) While CALCRIM No. 401 requires an intent to aid and abet "the crime," it does not instruct the jury that the aider and abettor must personally harbor that mental state of implied malice to be convicted of second degree murder. (*Id.* at p. 714.) Stated another way, the instruction does not require an aider and abettor to have known that the act aided and abetted was life-threatening or require the aider and abettor to have personally acted with conscious disregard to human life. (*Ibid.*) The instructions were therefore erroneous. (*Ibid.*)

In *Langi*, the Court of Appeal applied *Powell*'s reasoning to a section 1172.6 petition. There, defendant Langi was convicted of second degree murder, battery, and robbery in connection with the beating death of a robbery victim. (*Langi, supra,* 73 Cal.App.5th at p. 975.) The victim died after someone in a group, which included Langi, punched him, causing him to fall and hit his head. (*Ibid.*) "As the case was tried, the jury could have found [the defendant] guilty as an aider and abettor even if it found that someone else threw the fatal punch." (*Id.* at p. 980.) Langi's jury was not instructed on the natural and probable consequences doctrine but was instructed on second degree murder under CALJIC No. 8.31 and aiding and abetting under CALJIC No. 3.01. (*Id.* at pp. 980–981.) The *Langi* court commented that CALJIC No. 3.01 was "identical in relevant substance" to CALCRIM No. 401. (*Id.* at pp. 980–981, 983.)

Langi petitioned for resentencing under section 1172.6, which the trial court summarily denied. The Court of Appeal reversed, finding he was entitled to an evidentiary hearing because the instructions permitted him to be found guilty of aiding and abetting second degree murder without finding he personally acted with malice. (*Langi, supra,* 73 Cal.App.5th at p. 984.)

18.

Applying *Powell*'s reasoning in the section 1172.6 context, the *Langi* court found that although the aiding and abetting instruction stated that a person aids and abets a crime if he or she acts "with *knowledge of the unlawful purpose of the perpetrator,* and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime," "the second-degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death." (*Langi, supra,* 73 Cal.App.5th at p. 982.) "Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id.* at pp. 982–983.) The instructions, thus, permitted the jury "to conclude that, to be guilty as an aider and abettor of second degree murder, [the defendant] need only have intended to encourage the perpetrator's intentional act—in this case, punching [the victim]—whether or not [the defendant] intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Id.* at p. 983, fn. omitted.)

The aiding and abetting instruction created an ambiguity in *Langi* under which the jury could "find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi, supra,* 73 Cal.App.5th at p. 982, fn. omitted.) In other words, it did not require the jury to determine whether the defendant knew the act he aided (i.e., the punch) was life-threatening or whether he acted with indifference to human life. (*Ibid.*) As the record of the defendant's conviction did

19.

not conclusively negate the possibility that the jury found him guilty as an aider and abettor on an imputed malice theory, an evidentiary hearing was required. (*Id.* at p. 984.)

The *Berry-Vierwinden* court disagreed with *Langi*'s holding. There, the Court of Appeal affirmed the denial of a section 1172.6 petition at the prima facie stage. The case involved a similar instructional problem to the one presented here. The decision relied on the requirement in section 1172.6, subdivision (a)(3), that the petitioner must "establish that he ' "could not presently be convicted of murder or attempted murder *because of changes* to Section 188 or 189 made effective January 1, 2019." ' " (*Berry-Vierwinden, supra,* 97 Cal.App.5th at p. 933.)

The court concluded the issue with the jury instructions in that case could have been raised on direct appeal under *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*). (*Berry-Vierwinden, supra,* 97 Cal.App.5th at p. 935.) *McCoy* held that " ' "when guilt does not depend on the natural and probable consequences doctrine, … the aider and abettor must know and share the murderous intent of the actual perpetrator." ' " (*Berry-Vierwinden*, at p. 935.) Thus, it was *McCoy* that created the basis for the jury instruction issue; SB 1437 did not create the issue. (*Berry-Vierwinden, supra,* at pp. 935–936; see also *People v. Flores* (2023) 96 Cal.App.5th 1164, 1173 (*Flores*) ["When Flores was convicted in 2010, a provocative act murder conviction required the defendant personally harbor malice, whether it was the defendant or an accomplice who committed the provocative act that caused the death"]; *People v. Burns* (2023) 95 Cal.App.5th 862, 868 (*Burns*) ["The Supreme Court's *McCoy* decision … made clear that the direct perpetrator's mental state could *not* be imputed to an aider and abettor, whose mental state had to be independently evaluated"].) Because SB 1437 did not change the law in effect at the time of the petitioner's 2013 trial—that a direct aider and abettor must act with malice—the petitioner in *Berry-Vierwinden* could not meet section 1172.6,

subdivision (a)(3), and thus was not entitled to resentencing relief. (*Berry-Vierwinden*, at pp. 936–937.)

The *Berry-Vierwinden* court disagreed with *Langi* to the extent it "can be read to suggest that such an instructional error may be asserted as a basis for section 1172.6 relief—even if the alleged error could have been raised on direct appeal under then-existed law not changed by Senate Bill No. 1437." (*Berry-Vierwinden*, at 97 Cal.App.5th at p. 936.) The court noted that *Langi* "did not consider the language of section 1172.6, subdivision (a)(3) requiring that defendants show they can no longer be convicted of murder 'because of changes' made by Senate Bill No. 1437." (*Berry-Vierwinden*, at p. 936.)

After considering these issues and the split of authority, we are persuaded by the analysis more recently developed in *Berry-Vierwinden* and its predecessors, *Flores* and *Burns*, and conclude Lopez is not entitled to relief as a matter of law. Like the petitioner in *Berry-Vierwinden*, Lopez claims he is entitled to relief based on ambiguous instructions that permitted his jury to convict him of murder as an aider and abettor on an imputed malice theory. This claim is not cognizable in a section 1172.6 petition because it is not based on the substantive changes that SB 1437 made to sections 188 or 189, effective January 1, 2019. (*Berry-Vierwinden, supra,* 97 Cal.App.5th at p. 936; § 1172.6, subd. (a)(3).) He could have advanced the same claim in his direct appeal from his 2007 conviction, and he has forfeited the claim by failing to raise it in his direct appeal. (*Burns, supra,* 95 Cal.App.5th at pp. 867–868.) His petition was properly denied.

## DISPOSITION

The trial court's November 9, 2022, order denying Lopez's Penal Code section 1172.6 petition is affirmed.

                                                            SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


MEEHAN, J.

22.